IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 10-574 |
| | : | |
| BRISTOL ALLOYS, INC. | : | |
| JAMES R. BULLICK | : | |

GOVERNMENT'S GUILTY PLEA MEMORANDUM

I. INTRODUCTION

The government has filed an information charging defendants Bristol Alloys, Inc. and James R. Bullick with one count of major fraud against the United States, in violation of 18 U.S.C. § 1031. The charges arise from the defendants' fraudulent activities in supplying a Navy subcontractor with metal that did not conform to required military specifications and providing counterfeit certified material test reports and counterfeit heat treatment certifications.

II. PLEA AGREEMENTS

The defendants have each agreed to plead guilty to the charge in a written plea agreement, a copy of which is attached to this memorandum.

III. ESSENTIAL ELEMENTS OF THE OFFENSE

The defendants are charged with one count of violating 18 U.S.C. § 1031. The essential elements of this offense are:

1. That the defendant knowingly and willfully executed or attempted to execute a scheme or artifice with the intent to defraud the United States, or to obtain money or property by means of materially false or fraudulent pretenses, representations, and promises, as charged;

2. That the scheme took place as a part of the procurement or acquisition of property as a contractor with the United States or as a subcontractor or a supplier on a contract with the United States; and

3. That the value of the contract was one million dollars or more.

Title 18, United States Code, Section 1031(a) provides:

Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent-

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of the contract, subcontract, or any constituent part thereof, for such property or services is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

In <u>United States v. Brooks</u>, 111 F.3d 365, 368-69 (4th Cir. 1997), the court held:

From a straightforward reading of this statute, we conclude that regardless of its privity with the United States, any contractor or supplier involved with a prime contract with the United States who commits fraud with the requisite intent is guilty so long as the prime contract, a subcontract, a supply agreement, or any constituent part of such a contract is valued at $1 million or more. . . . By extending the statute's coverage even to minor contractors and suppliers whose fraudulent actions could undermine major operations, Congress enabled prosecutors to combat effectively the severe procurement fraud problem that Congress identified.

IV. **MAXIMUM PENALTIES**

   A. **Defendant Bristol Alloys, Inc.**

   Count One (Major Fraud Against the United States): Five years probation, a $5,000,000 fine, mandatory restitution, and a $400 special assessment.

   B. **Defendant James Bullick**

   Count One (Major Fraud Against the United States): 10 years imprisonment, a 3 year period of supervised release, a $5,000,000 fine, mandatory restitution, and a $100 special assessment.

   The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by up to 2 years per count of conviction in the case of Class C felonies. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

V. **FACTUAL BASIS OF GUILTY PLEA**

   A. **Facts**

   Northrop-Grumman Ship Building (NGSB) is a first tier subcontractor to the General Dynamics Electric Boat Corporation (EB) under prime contract numbers N00024-03-C-2101 and N00024-09-C-2104 for the construction, final assembly, test and delivery of 14 Virginia Class Submarines (VCS) for the U.S. Navy. The total value of these two contract awards exceeds $22 billion. As part of their subcontracting work,

3

NGSB awarded a purchase order 4500162975 to Garvey Precision Machine Inc (Garvey), Willingboro, NJ, for various metal components utilized within the hull of the submarines. The purchase order required Garvey to manufacture the snorkel faring assembly to the EB drawing H643-6502 and Federal Specification QQ-N-281D.  The snorkel faring assembly is made up of number of component parts, including a snorkel hoist pipe flange.  The specifications also required the material used in manufacturing the snorkel hoist pipe to be rolled, nickel-copper alloy plate with a hot finish rather than annealed and air cooled. The specification also called for alloy plate to withstand a minimum pressure of 40,000 pounds per square inch (PSI).

In December 2008, Garvey submitted an electronic vendor request (VIR) to NGSB requesting acceptance of a nickel-copper alloy flange manufactured by Newman Flange & Fitting Company (Newman), Newman, CA. The Newman flange was supplied to Garvey by intermediate distributor Bristol Alloys, Inc., the defendant.  Defendant Bristol Alloys, Inc. ("Bristol"), in turn, was responsible for having the flange meet PSI requirements and heat treatment.  Bristol provided to Garvey test certification reports purportedly prepared by Donovan Heat Treating Company (Donovan), Philadelphia, PA, to document compliance with the heat treating requirement of the flanges and other parts.

From March 2009 through June 2009, prime contractor EB held critique meetings to identify various systemic problems with the base material technical requirements affecting product delivery.  The critiques revealed problems with Garvey

relating to the quality of material certification reports. EB initiated a corrective action to Garvey to evaluate all products they supplied for the submarine program.

In August 2009, as part of the corrective action, Garvey contacted Donovan about the test certification reports submitted by defendant Bristol Alloys, Inc. Donovan informed Garvey that Donovan had not prepared such certifications for Bristol despite the fact that the documents appeared to be on Donovan letterhead. Donovan stated the readings and serial numbers were not consistent with their internal controls for heat treating.

In August 2009, NGSB informed EB that NGSB was conducting an investigation concerning Garvey, an action initiated by the discovery that Bristol had also supplied two separate and distinct flanges to Garvey under the NGSB purchase order accompanied by identical test reports from raw material supplier Newman. Newman informed NGSB that Newman had not prepared the identical test reports for Bristol.

In early September 2009, Garvey issued a letter to EB documenting the discovery of non-conformances on previously delivered orders attributed to Bristol. EB Supplier Quality officials continued to request and examine test records on Garvey purchase orders, specifically with a Bristol subcontract. EB and Garvey attempted on several occasions during this time to contact Bristol for their original copies of mechanical and heat test reports they had provided to Garvey. Bristol refused this request with no explanation.

Since September 2009, US Navy officials have discovered additional evidence of false certifications supplied by Bristol in connection with the delivery of metal parts for use in the construction of submarines and other vessels.  For example, Navy officials have determined that in August 2002, Bristol provided Garvey with test certification reports that it falsely and fraudulently represented as having been prepared by Slater Steel Corporation, Fort Wayne, Indiana, to document compliance with the heat treating requirement of the flanges and other parts.  This occurred in connection with Garvey's subcontract under prime contract N00024-96-C-2100 for the construction, final assembly, test and delivery of four Virginia Class Submarines (VCS) for the U.S. Navy.  Navy officials have also identified non-conforming materials (i.e., materials that do not meet strength and/or heat treating specifications) distributed by Bristol to Garvey for use in the construction, final assembly, test and delivery of eight Virginia Class Submarines (VCS) for the U.S. Navy under prime contract N00024-09-C-2104, a Los Angeles class submarine S.S.N. Toledo, and the air craft carrier CV-78 Gerald R. Ford.

On October 30, 2009, NCIS agents executed a search warrant at the business location of Bristol Alloys, Inc.  Among the records seized are documents that demonstrate that defendant James Bullick, the president of Bristol Alloys, Inc., intentionally falsified material certifications on the letterhead of Donovan Heating in order to fraudulently obtain payment from Garvey for metal parts that did not meet military specifications.

If the case were to proceed to trial, the government's trial evidence would include the following:

**A.     Witnesses**

1.     <u>D.M., Quality Assurance Manager, Garvey Precision Machine, Inc</u>.

D.M. would testify regarding the practices and procedures for quality control in place at Garvey, including the review of material certifications from suppliers such as Bristol Alloys, Inc.  D.M. had extensive contact with defendant James Bullick and would testify that, based on her interactions with Bullick regarding the Garvey orders placed with Bristol Alloys, Bullick was aware that the materials that Bristol Alloys supplied to Garvey were intended for use on U.S. Navy ships and submarines.  D.M. provided General Dynamics Electric Boat specifications and Quality Assurance Manuals to defendant Bullick.  D.M. has participated in conference calls with Bullick and representatives from Newport News Shipbuilding regarding military contract work.  Bristol Alloys has supplied various materials to Garvey in connection with prime vendor contracts with the U.S. Navy.  With respect to Garvey subcontract work for Electric Boat or Newport News, the purchase order documentation contains information that references FARs, and Electric Boat specifications, among other things.  In cases where the work is for a Level 1/Subsafe application, which is the designation that the part or material is essential to the integrity of the ship or the submarine, the purchase order is stamped with "Level 1" using a stamp maintained by Garvey.  D.M. would testify that she always dealt

7

directly with defendant Bullick regarding any quality assurance or quality control issues, and that, based on her course of dealing with him, it is clear to her that he was aware that the materials supplied by Bristol Alloys to Garvey were intended for U.S. military applications.

D.M. would also testify that she noticed that some of the material certifications that she received from Bristol Alloys were whited out. When she questioned Bullick regarding the white outs, he told her that Bristol Alloys did not want to identify its suppliers to Garvey. He did not disclose to D.M. that he had submitted false and fraudulent heating certifications to Garvey.

    2.    <u>J.R., General Manager, Garvey Precision, Inc.</u>

J.R. would testify that he has been employed by Garvey for 37 years and has been the general manager since 1983. He has regular contact with the Quality Control and Quality Assurance personnel at Garvey. He is familiar with Bristol Alloys, Inc. and has always dealt with defendant James Bullick regarding business matters. Bristol Alloys would provide additional outside services such as heat treating, as Garvey did not have the ability to perform this type of work. J.R. would generally fax a Request for Quote directly to Bullick's attention. Bullick was the only Bristol Alloys employee who would respond to the request in his experience. Upon selection of Bristol Alloys as the supplier by Garvey, J.R. would send a Garvey purchase order to Bullick that would alert Bristol

Alloys to the fact that the material was being used for some type of U.S. military application.

        3.    <u>P.O., salesman, Bristol Alloys, Inc.</u>

P.O has known defendant James Bullick since the late 1990s or early 2000. They met when both worked at Coppola Metals. He reunited with Bullick in approximately 2004 when he was hired in a sales position at Bristol Alloys. He is now retired but, as of October 2009, was still doing some work for Bristol Alloys on a part-time basis. P.O. did not service government accounts or government contractors because Bullick was solely responsible for those accounts. He would testify that it was common knowledge at Bristol Alloys that some of its customers such as Garvey Precision Machine, Inc. did work on behalf of the Navy on the submarine program. Bullick handled the Garvey account entirely by himself.

        4.    <u>D.F., former sales employee, Bristol Alloys, Inc.</u>

D.F. worked at Bristol Alloys from March 2007 through March 2009. Her duties included answering the phone and servicing some of the smaller customer accounts. Customers with government contracts such as Garvey Precision Machine, Inc. were exclusively handled by defendant James Bullick. Any calls that she received from Garvey would be referred to Bullick. Bullick was responsible for any issues relating to heat treating certifications.

5.	J.U., President, Donovan Heat Treating Company, Inc.

J.U. would testify that Donovan Heat Treating Company has been in business more than 60 years and specializes in heat treating and abrasive sandblasting services to steel warehouses, metal distributors, metal fabricators and manufacturers, foundry and forge shops, steel mills and most commercial industries.  Donovan has received heat treating work for metal and steel parts for over 8 years from defendant Bristol Alloys, Inc. and J.U. has known defendant James Bullick during that entire time.  Bristol Alloys is a metal/steel parts broker that would purchase metals from mills and after-market suppliers.

J.U. was contacted by representatives of General Dynamics Electric Boat in October 2009 when the allegations regarding Bristol Alloys surfaced concerning altered heat and material certifications on U.S. Navy submarine programs.  Prior to 2009, all heat treating work from Bristol Alloys was for hardness only and J.U. does not recall any parts from Bristol Alloys that were marked "Level 1."  All work that Donovan handles receives a unique 5 digit order number that can be traced to a particular job, heat treatment, and customer.  None of these order numbers are duplicated or utilized for other jobs and customers. J.U. was shocked when General Dynamics Electric Boat and the U.S. Navy notified him that some Bristol heat certifications from Donovan may have been altered.  The Donovan heating job numbering system was right around job number 47000 as of June, 2010 and that there should be no job numbers higher than that figure on any

certifications from Donovan. J.U. would testify that Donovan did not perform Level 1 heat treating for Bristol Alloys.

If the case were to proceed to trial, J.U. would testify that heating certifications identified in the chart below are fraudulent and not genuine Donovan certifications.

6. <u>J.C., President, Garvey Precision Machine, Inc.</u>

J.C. would testify that he purchased GPM in 1995 and that the company mainly does work on government contracts, primarily those involving Virginia Class submarines under subcontracts with General Dynamics Electric Boat Corporation and Northrop Grumman Shipbuilding entities in Groton, CT and Newport News, VA. J.C. was not aware that defendants Bristol Alloys and James Bullick had supplied fraudulent heating test certifications to GPM. In the winter or early Spring of 2009, J.C. contacted Bullick to discuss the subject of heating test certifications provided to GPM by Bristol Alloys. Bullick was uncooperative and refused to discuss the matter with him. As a result, at or about the end of April 2009, GPM stopped doing business with Bristol Alloys. In or about June 2009, GPM employee D.M. discovered what appeared to be discrepancies in several material certifications and test reports provided to GPM by Bristol Alloys. The company cooperated with Navy investigators and representatives of the government contractors to identity the fraudulent heating test certifications that were submitted by the defendants.

7.  Examples of False Heat Treating Certifications and False Certified Material Test Reports Referenced in the Information.

As explained above, rather than comply with the heat treating requirements of the GPM purchase orders, defendants Bristol Alloys, Inc. and James Bullick instead created numerous fraudulent heating test certifications purportedly issued by Donovan Heat Treating Company, Inc. which had been falsely altered to reflect heat treatments in accordance with the GPM purchase order requirements that, in fact, had never actually been completed, including, among others, the following:

| Shipment Dates | Garvey Job No. | Description of Item Manufactured with Metal Supplied by Bristol Alloys, Inc. | False Heating Cert. No. |
|---|---|---|---|
| 8/28/2006 11/29/2007 | 5577 | Piston tailrod used in hydraulic accumulator to indicate fluid capacity and align piston travel. (Prime contract number N00024-03-C-2101) | A43391 |
| 6/4/2007 | 5828 | Piston tailrod used in hydraulic accumulator to indicate fluid capacity and align piston travel. (Prime contract number N00024-03-C-2101) | A42729 |
| 9/26/2007 9/27/2007 | 5846 | Piston tailrod used in hydraulic accumulator to indicate fluid capacity and align piston travel. (Prime contract number N00024-03-C-2101) | A932891 |
| 9/3/2008 | 5878 | Piston tailrod used in hydraulic accumulator to indicate fluid capacity and align piston travel. (Prime contract number N00024-09-C-2104) | A932892 |

| | | | |
|---|---|---|---|
| 9/15/2008 | 5886 | Piston tailrod used in hydraulic accumulator to indicate fluid capacity and align piston travel. (Prime contract number N00024-09-C-2104) | A932942 |

The defendants also created numerous fraudulent certified material test reports purportedly issued by, among others, Electralloy and Huntington Alloys, which had been falsely altered to reflect that metals supplied to GPM in connection with GPM's U.S. Navy subcontracts met all purchase order specifications and requirements when, in fact, such metals did not meet such specifications and requirements, including, among others, the following:

| Shipment Dates | Garvey Job No. | Item Manufactured with Metal Supplied by Bristol Alloys, Inc. | False Material Cert. No. |
|---|---|---|---|
| 5/28/2004 6/14/2004 | 5577 | Tailrod bushing for hydraulic accumulator that retains hydraulic pressure around the piston tailrod. (Prime contract number N00024-03-C-2101) | Huntington Alloys M5233BR-15 |
| 7/7/2004 | 5579 | Grease fitting and cap for snorkel induction mast that provides grease for the packing between the inner and outer pipe for air into the submarine. (Prime contract number N00024-03-C-2101) | Electralloy E2530-1FA-1 |

| 7/7/2004 | 5579 | Magnet receptacle for snorkel induction mast that provides telemetry to signal to the control room the position of the snorkel mast. (Prime contract number N00024-03-C-2101) | Electralloy E2530-1FA-1 |
|---|---|---|---|
| 8/4/2008 9/3/2008 | 5877 | Tailrod bushing for hydraulic accumulator that retains hydraulic pressure around the piston tailrod. (Prime contract number N00024-03-C-2101) | Electralloy E2530-1FA-1 |
| 8/4/2008 9/3/2008 | 5878 | Hex plug for hydraulic accumulator that retains hydraulic pressure on the accumulator. (Prime contract number N00024-09-C-2104) | Electralloy E2530-1FA-1 |
| 8/4/2008 9/3/2008 | 5878 | Tailrod bushing for hydraulic accumulator that retains hydraulic pressure around the piston tailrod. (Prime contract number N00024-09-C-2104) | Electralloy E2530-1FA-1 |

8.  <u>Other witnesses and evidence.</u>

In the course of the investigation, Navy officials and representatives of the contractors discovered that the defendants had supplied other fraudulent heating test certifications from other companies. For example, in August, 2009, GPM discovered that the certified material test report for a Western Forge flange supplied by Bristol Alloys to GPM in March 2009 was not valid. In December 2008, GPM rejected a Western Forge flange from Bristol for failing to meet purchase order requirements and ordered Bristol Alloys to replace it at no charge. The replacement flange was delivered in March 2009. The flange was welded on the tube for forming a standpipe for a snorkel. When GPM separately asked Western Forge for confirmation of its certification, Western denied providing any certification except for the flange, which they had sold to Bristol in 2008

and which is the same flange that GPM rejected in December 2008.  P.G., an employee of Western Forge in Cleveland, Texas, would testify that the CMTR supplied to GPM by Bristol Alloys, dated March 3, 2009, is false and fraudulent, and is an altered copy of a CMTR that it provided to Bristol Alloys, Inc. on November 26, 2008.

As a consequence of the defendants' crimes, U.S. Navy officials across the globe, along with representatives of Northrop-Grumman and Electric Boat, were required to undertake an assessment of the impact of nonconforming metal parts supplied by Bristol Alloys to GPM on submarines and other vessels.  The efforts to identify the extent to which nonconforming parts supplied by Bristol Alloys existed in Navy ships and submarines were led by General Dynamics Electric Boat and Northrop Grumman Shipbuilding, along with the Navy Submarine directorate, NAVSEA Office of Counsel, Supplier Product Quality, SUPSHIP Groton - Supervisor of Shipbuilding Groton and the Defense Contract Management Agency.  Among the many Naval commands and program offices who participated in the efforts were the following:

Virginia Class Submarine Commands

Naval Surface Warfare Center Carderock

Naval Undersea Warfare Center Portsmouth

Structural Integrity Surface Ships

Structural Integrity Submarines

Machinery-Electrical Systems - Ships

machinery - Propulsion & Power Systems - Non-nuclear Ships

Supplier Product Quality

Supervisor of Salvage and Diving - Diving System Safety Certification

Safety and Quality Assurance Division

Deep Submergence System Scope of Certification Technical Requirements

Submarine Acoustic Systems Program Office

Commander, Naval Sea Systems Command

Deputy Commander, Engineering

Program Executive Officer Submarines


A cost impact analysis was performed by compiling the total man hours and, where applicable, the replacement costs associated with the identification of nonconforming metal parts supplied by Bristol Alloys.  The effort is continuing, and will likely continue for many months ahead.  As of now, the government has incurred $1,355,653 in additional costs in this effort as a result of the defendants' criminal activities.

    Respectfully submitted,

    ZANE DAVID MEMEGER
    United States Attorney


    */s/ John J. Pease*
    JOHN J. PEASE
    Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date shown below, a copy of this pleading was sent to counsel on this date by e-mail to the following:

Michael J. Diamondstein, Esq.
Two Penn Center Plaza
15th and JFK Blvd., Ste. 900
Philadelphia, PA 19102

/s/ John J. Pease
JOHN J. PEASE
Assistant United States Attorney

Date: September 27, 2010